UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                                        Criminal Case No. 19-20155-1
v.                                       Honorable Linda V. Parker

JESSE HAWKINS (D-1),

        Defendant.
_____/

## **OPINION AND ORDER**

On March 20, 2019, a federal grand jury returned a three-count indictment charging Jesse Hawkins ("Jesse") and his brother Price Hawkins (collectively Defendants) with firearm offenses. Jesse is charged in two counts of the Indictment: (1) Receipt of a Firearm While Under Indictment in violation of 18 U.S.C. § 922(n); and (2) Possession of an Unregistered Firearm in violation of 26 U.S.C. §§ 5841, 5861(d) and 5871. The matter is presently before the Court on the following motions filed by Jesse:[1]

    (1) Motion for Disclosure of Witness List, Exhibit List and Additional
        Witness Information in Advance of Trial (ECF No. 43);

_____

[1] Jesse has also filed a motion in limine (ECF No. 41), which is pending before the Court and for which supplemental briefing is being submitted. The Court will enter a separate decision with respect to that motion once the supplemental briefing is complete.

(2) Motion to Suppress Evidence (Cell Phone) (ECF No. 45); and,

(3) Motion to Suppress Post-Arrest Statement (ECF No. 48).

The motions have been fully briefed. The Court held a hearing with respect to Jesse's motion to suppress his post-arrest statement, only, on November 13, 2019.

## Background

The charges against Defendants arise from the Michigan State Police ("MSP") Department's investigation of drug sales by Jesse at the home he shared with his family in Inkster, Michigan. On June 6, 2018, MSP Detective Trooper Jeff Rucinski signed and submitted an affidavit in support of a warrant to search the home. According to the affidavit, a Canton Township Police Department confidential informant ("CI") reported that a narcotics trafficker with the street name "Lil Jesse" sells marijuana out of the residence, where he lives with his mother, father, and brothers. (Aff. for a Search Warrant at 3.)

The CI reported that Lil Jesse uses a cell phone to conduct narcotic sales and the CI shared that number with law enforcement. (*Id.*) Using a database, officers linked the cell phone number to Jesse. (*Id.*) When shown a photograph of Jesse, the CI confirmed that this was who the CI was referring to as "Lil Jesse." (*Id.*) The CI also was shown a photograph of the residence, which the CI identified as the location where Jesse sells marijuana. (*Id.*) According to the CI, Jesse sometimes has his brothers sell the marijuana for him if he is not home. (*Id.*) The

2

CI indicated that he had purchased marijuana from Jesse at the residence on numerous occasions. (*Id.*)

The CI also informed law enforcement that Jesse has several firearms inside the residence. (*Id.*) According to the CI, Jesse showed him a mini Draco AK-47, a micro Draco AK-47, an AR-15 (with a 100-round drum), an MP40 submachine gun, and pistols inside the residence. (*Id.*)

Within forty-eight hours of Detective Trooper Rucinski's affidavit, the CI made a controlled purchase of marijuana from Jesse at the Inkster residence. (*Id.* at 5.) The CI reported that Jesse had a pistol on his person inside the residence during the drug transaction and that the CI observed a mini Draco AK-47 in the living room. (*Id.*) The CI does not have a medical marijuana card and had been deemed reliable by law enforcement on at least two previous occasions. (*Id.*)

Detective Trooper Rucinski stated in his affidavit that he knows, based upon his training and experience, that drug traffickers usually keep firearms to protect the drugs they distribute and the proceeds from that distribution. (*Id.* at 2-3.) Detective Trooper Rucinski added that drug traffickers also commonly use electronic equipment, including mobile and cellular phones, to aid them in their drug trafficking activities. (*Id.*) Further, according to Detective Trooper Rucinski, drug traffickers take or cause to be taken photographs of themselves, their

associates, their property, and their product, which are commonly kept at their residences.  (*Id*.)

The search warrant, issued by a judicial officer in Michigan's 36th District Court on June 6, 2018, allowed for the search of the Inkster residence and the seizure of *inter alia* "[a]ny and all communication devices including but not limited to cell phones and pagers."  (*Id*. at 7.)  The warrant further authorized "[t]he search, seizure, manual examination and the forensic examination of any and all … communication devices …, including but not limited to cell phones …."  (*Id*.)  Law enforcement officers executed the search warrant on June 7, 2018.  Jesse, his girlfriend, Price, and other family members were present at the time.

Jesse was in the home's southwest bedroom when the officers arrived.  In the bedroom, the officers found a magazine rifle, marijuana packaged into 23 separate baggies, a digital scale, money (including money whose serial numbers matched the money the CI used in the controlled drug buy less than 48 hours earlier), and Jesse's cell phone.  Another firearm was found in the kitchen.

Price was in the basement when the officers arrived, which was set up as a bedroom.  His phone, which was on the bed, was seized by the officers.  Next to the bed was a duffle bag containing ammunition and a short-barreled rifle.  The officers subsequently reviewed text messages on and completed a forensic examination of Price's phone.

On March 17, 2019, Bureau of Alcohol, Tobacco and Firearms ("ATF") agents arrested Jesse pursuant to a warrant issued in this case and ATF Special Agent Matthew Rummel ("Agent Rummel") and MSP Detective Trooper Jeff Rucinski interrogated him. The interview was recorded, and a copy was filed on the docket. Jesse and the Government also supplied the Court with their transcriptions of the interview. (ECF Nos. 48-1, 61-1.)

### Motion for Disclosure of Witness List, Exhibit List and Additional Witness Information in Advance of Trial (ECF No. 43)

Jesse seeks to compel the Government to provide its witness and exhibit lists and witness information prior to trial, including the grand jury testimony of any witnesses. He argues that early disclosure of this information is needed "to permit reasonable preparation by the defense." (Mot. at 2, ECF No. 43 at Pg ID 157.) The Government opposes Jesse's motion, arguing that disclosure is not required by law. The Government indicates, however, that it will provide any *Jencks* Act materials to Jesse one week before trial.

It is well-settled that there is no general constitutional right to discovery in a criminal case. *See Weatherford v. Bursey*, 429 U.S. 545, 559 (1997); *United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir. 1988). This rule is tempered by the prosecution's obligation under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), to provide the defendant with information favorable to his defense and material to either guilt or punishment. "It does not follow from the prohibition against

concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably." *Weatherford*, 429 U.S. at 559; *see also United States v. Todd*, 920 F.2d 399, 405 (6th Cir. 1990) (quoting *Weatherford*, 429 U.S. at 559) ("[t]he Supreme Court has made clear that the *Brady* rule is not an evidentiary rule which grants broad discovery powers to a defendant and that '[t]here is no general right to discovery in a criminal case.'")

Rule 16 of the Federal Rules of Criminal Procedure likewise does not require the disclosure of witness names. *United States v. Conder*, 423 F.2d 904, 910 (6th Cir. 1970); *see also United States v. Dark*, 597 F.2d 1097, 1099 (6th Cir. 1979); *United States v. Carter*, 621 F.2d 238, 240 (6th Cir. 1980) (explaining that Rule 16 "has never been held to provide a broader basis for discovery than 18 U.S.C. § 3500[,]" which provides that the "United States is generally under no duty to provide the statement of a government witness until that witness has testified on direct examination in the case."). This District's Standing Order for Discovery reflects the absence of a general duty to disclose the names of government witnesses before trial: "[G]overnment counsel [shall not] be required to automatically disclose the names of government witnesses." E.D. Mich. Standing Order for Discovery & Inspection & Fixing Motion Cut-Off Date in Criminal Cases at 2 (Oct. 2003). The order requires the parties to submit their list of witnesses the day before trial for the court's review, only, "[t]o enable the judge to

better estimate the length of trial[.]" *Id.* at 4. The order further provides that exhibit lists must be submitted to the court, only, three days prior to trial. *Id.* at 3. As reflected in the Scheduling Order initially entered in this case on April 1, 2019, the undersigned generally requires the parties to submit their witness lists to chambers two weeks before trial. (ECF No. 21.)

While Jesse cannot obtain the discovery requested as a matter of right, the Sixth Circuit has indicated that district courts have the discretion to order the prosecution to produce discovery "when justice requires it[.]" *See United States v. Kendricks*, 623 F.2d 1165, 1168 (6th Cir. 1980) (citations omitted); *Presser*, 844 F.2d at 1285 n.12. And to obtain early disclosure of grand jury material, a defendant must show a "compelling necessity . . . a 'particularized need' rather than a general one." *United States v. Short*, 671 F.2d 178, 184 (6th Cir.), *cert. denied*, 457 U.S. 1119 (1982). This is a " 'difficult burden' " to satisfy. *United States v. Azad*, 809 F.2d 291, 295 (6th Cir. 1986) (quoting *United States v. Battista*, 646 F.2d 237, 242 (6th Cir.), *cert. denied*, 454 U.S. 1046 (1981)).

Jesse fails to demonstrate that justice requires the early disclosure of the Government's witness or exhibit lists or that there is a "compelling necessity" or "particularized need" for the disclosure of grand jury material. He does not identify any circumstances that distinguish his case from every other criminal

proceeding.  The facts supporting the charges against Defendants are straightforward; the evidence is not voluminous or complex.

For these reasons, the Court is denying Jesse's Motion for Disclosure of Witness List, Exhibit List, and Additional Witness Information in Advance of Trial.

## Motion to Suppress Evidence (Cell Phone)

Jesse seeks to suppress evidence seized from his cell phone, arguing that the evidence is unrelated to the initial basis for the probable cause to seize and search the phone—that being, Jesse's alleged narcotics trafficking.  Jesse argues that the search warrant was unduly broad in that it allowed the officers to search for evidence on the phone that was unrelated to his alleged drug dealing.

## Applicable Law & Analysis

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no [w]arrants shall issue, but upon probable cause, supported by [o]ath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. Amend. IV.  "By limiting the authorization to search to the specific areas and things for which there is probable cause to search," the Fourth Amendment "ensures that the search will be carefully tailored to its justifications, and will not take on the character of the

wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

Courts therefore interpret the Fourth Amendment's requirements as encompassing two related but distinct concepts: "'whether the warrant supplies enough information to guide and control the agent's judgment in selecting what to take; and … whether the category as specified is too broad in the sense that it includes items that should not be seized.'" *United States v. Richards*, 659 F.3d 527, 537 (6th Cir. 2011) (quoting *United States v. Upham*, 168 F.3d 532, 535 (1st Cir. 1999)) (additional citations and internal quotation marks omitted in *Richards*). Jesse focuses on the latter, asserting that the warrant was overly broad and failed to establish probable cause to search his phone for anything but evidence of his alleged drug trafficking.

The Sixth Circuit has advised "that the degree of specificity in a warrant must be flexible, depending upon the type of items to be seized and the crime involved." *United States v. Blair*, 214 F.3d 690, 697 (6th Cir. 2000) (citations omitted). Detective Trooper Rucinski's affidavit provided probable cause to issue a warrant to seize and search Jesse's cell phone. *See United States v. Sims*, 508 F. App'x 452, 460 (6th Cir. 2012) (citing *United States v. Giacalone*, 853 F.2d 470, 478 (6th Cir. 1988)) (explaining that the "only probable cause necessary" to secure a warrant or wiretap for a cell phone "is that the phone itself is being used in

connection with an offense or commonly used by someone committing the offense."); *see also United States v. Jefferson*, No. 14-20119, 2015 WL 3576035, at *3-5 (E.D. Mich. June 5, 2015) (finding probable cause to search cell phone where affidavit established that phone belonged to suspect who was strongly connected to criminal activity, including shootings and assaults); *United States v. Gholston*, 993 F. Supp. 2d 704, 718-21 (E.D. Mich. 2014) (collecting cases) (finding probable cause to search cell phone in connection with robbery because phone could show coordination and pre-planning among suspects). The warrant also was specific as to what evidence the officers were searching for—that is, evidence of Jesse's narcotics trafficking, which included firearms.

Defendant argues that the warrant was overly broad because it did not restrict where in the phone the officers could search for evidence of Jesse's alleged drug activities. However, case law establishes that like computers and other electronics devices, information can be stored anywhere on today's cell phones. *See United States v. Richards*, 659 F.3d 527, 538-39 (6th Cir. 2011) (discussing in depth the Fourth Amendment's particularity requirement in the context of computer searches and noting that "[t]he problem with applying this [requirement] to computer searches lies in the fact that [] images could be nearly anywhere on the computers. Unlike a physical object that can be immediately identified as responsive to the warrant or not, computer files may be manipulated to hide their

true contents."); *United States v. Rarick*, 636 F. App'x 911 (6th Cir. 2016)

(applying *Richards*' reasoning to the search of the defendant's cell phone).

Therefore, when evaluating the search of an electronic device, the Sixth Circuit

"employ[s] the Fourth Amendment's bedrock principle of reasonableness on a

case-by-case basis":

> While officers must be clear as to what it is they are seeking on the
> computer and conduct the search in a way that avoids searching files
> of types not identified in the warrant, a computer search may be as
> extensive as reasonably required to locate the items described in the
> warrant based on probable cause.

*Richards*, 659 F.3d at 538. In the present matter, the officers were searching for

evidence of Jesse's drug trafficking, which included evidence of firearms used in

furtherance of those activities. It was reasonable to search videos and photos on

Jesse's phone for such evidence.

However, even if the warrant and search were overbroad, the plain view

exception applies in this case. "Under the plain view doctrine, 'if police are

lawfully in a position from which they view an object, if its incriminating character

is immediately apparent, and if the officers have a lawful right of access to the

object, they may seize it without a warrant.'" *United States v. Herndon*, 501 F.3d

683, 692 (6th Cir. 2007) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375

(1993)). The Government argues that Jesse is prohibited from possessing firearms

and thus it would have been immediately apparent to the officers searching his

phone that photos and videos reflecting his possession of a firearm constitute evidence of unlawful conduct. (Resp. at 10, ECF No. 59 at Pg ID 269.)

In reply, Jesse questions how the officers knew, when searching his phone, that he was prohibited from possessing firearms.[2] (*See* Reply Br. at 5, ECF No. 64 at Pg ID 304.) The affidavit in support of the warrant (which was attached to the warrant) reflected this information, however. As Detective Trooper Rucinksi stated in his affidavit: "Probation Officer John Lazarski documents [Jesse] Hawkins … as a probationer from the charges controlled substance-delivery/manufacture/marijuana/synthetic narcotic and felony firearm." (*See* Aff. ¶ 6(e).) As such, it would have been immediately apparent to the officers that photos and videos of Jesse possessing firearms were evidence of unlawful conduct. *See United States v. Luna-Santilanes*, 554 F. App'x 402, 410 (6th Cir. 2014) (photographs of the defendant holding firearms found to be evidence of unlawful possession).

---

[2] Jesse also seems to argue that, absent exigent circumstances, officers may not lawfully seize incriminating evidence found in plain view and must first obtain a second search warrant. (Reply at 5, ECF No. 64 at Pg ID 304.) In *Coolidge v. New Hampshire*, the Supreme Court stated that "[p]lain view *alone* is never enough to justify the warrantless seizure of evidence." 403 U.S. 443, 468 (1971) (emphasis added). Subsequently, however, the Court interpreted this phrase to mean that "in order for the plain-view doctrine to apply, a police officer must be engaged in a lawful intrusion or must otherwise legitimately occupy the position affording him a 'plain view.'" *Texas v. Brown*, 460 U.S. 730, 737 n.3 (1983). The search warrant provided the officers with the lawful authority to view the data in Jesse's cell phone.

The Court additionally finds the "good faith" exception applicable. In *United States v. Leon*, the Supreme Court created an exception to the exclusionary rule for evidence "seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." 468 U.S. 897, 905 (1984). Under this good faith exception, suppression is appropriate only if "'a reasonably well trained officer would have known that the search was illegal despite the magistrate's decision.'" *United States v. Helton*, 314 F.3d 812, 824 (6th Cir. 2003) (quoting *Leon*, 468 U.S. at 923 n.23). The *Leon* Court identified four circumstances when an officer's reliance on the magistrate's decision would not be objectively reasonable:

> (1) if the issuing magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) if the issuing magistrate failed to act in a neutral and detached fashion and merely served as a rubber stamp for the police; (3) if the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, or where the warrant application was supported by nothing more than a bare bones affidavit; and (4) if the warrant was facially deficient in that it failed to particularize the place to be searched or the things to be seized.

*United States v. King*, 227 F.3d 732, 753 (6th Cir. 2000) (citing *Leon*, 468 U.S. at 914-15). The instant case possibly presents only the third scenario.

"A bare-bones affidavit" is "one that states only 'suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge.'" *United States v. White*, 874 F.3d

13

490, 496 (6th Cir. 2017) (quoting *United States v. Laughton*, 409 F.3d 744, 748

(6th Cir. 2005)) (additional citation omitted).  In comparison, "an affidavit is not

bare bones if, although falling short of the probable-cause standard, it contains 'a

minimally sufficient nexus between the illegal activity and the place to be

searched.'"  *Id*. (quoting *United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir.

2004) (en banc)).  "If the reviewing court is 'able to identify in the averring

officer's affidavit *some* connection, regardless of how remote it may have been'—

'some modicum of evidence, however slight'—'between the criminal activity at

issue and the place to be searched,' then the affidavit is not bare bones and official

reliance on it is reasonable."  *Id*. (quoting *United States v. Laughton*, 409 F.3d 744,

748 (6th Cir. 2005)).

Here, Detective Trooper Rucinski's affidavit established a "minimally

sufficient nexus" between the narcotics activity at the residence and the search and

seizure of firearm evidence on Jesse's cell phone.  A reliable confidential

informant reported that Jesse sold marijuana and had sold marijuana to the

informant on numerous occasions.  The informant also indicated that Jesse used his

cell phone to conduct narcotic sales and that he possessed several firearms.  Based

on their training and experience, the officers also knew that individuals engaged in

drug trafficking commonly use firearms to protect the drugs they distribute and the

proceeds from their drug sales and take or cause to be taken photographs of themselves, their associates, their property, and their product.

For these reasons, the Court is denying Jesse's motion to suppress evidence recovered from his cell phone.

## Motion to Suppress Post-Arrest Statement

Jesse seeks to suppress his statement to Agent Rummel and Detective Trooper Rucinski on March 17, 2019, contending that the statement was obtained in violation of his Fifth Amendment rights. Specifically, Jesse argues that he did not knowingly, voluntarily, and intelligently waive his *Miranda* rights and that when he invoked his right to counsel, the officers failed to honor that invocation and continued to interrogate him. (ECF No. 48.) As to his first argument, Jesse maintains that unless he was presented with a written waiver form and a sufficient opportunity to reflect on his rights before being questioned, he could not have made a knowing and intelligent waiver.

In response to Jesse's motion, the Government argues that his waiver was made knowingly, intelligently, and voluntarily. The Government further argues that Jesse did not unequivocally and unambiguously invoke his right to counsel so as to render any further questioning by the officers unconstitutional. The Government indicates, however, that it will not use any portion of Jesse's statement after the 26:50 mark in the recording because "[t]here is little, if any,

value to the government's case to any statements made [thereafter]." (Resp. at 4, ECF No. 61 at Pg ID 279.)

In reply, Jesse raises a new argument to support the exclusion of his statements. He contends that many statements prior to the 26:50 mark—his *and* those of the officers—are not relevant or, at least, their probative value is outweighed by the danger of unfair prejudice. Because the Court does not know what statements the Government intends to use at trial, it will reserve ruling on their admissibility under the Federal Rules of Evidence until trial.[3]

## Applicable Law & Analysis

Under the Fifth Amendment, a suspect is guaranteed the right to remain silent and the right to the assistance of counsel during a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1986). There is no dispute that Jesse was in custody when the officers questioned him. Under *Miranda*, a suspect must be advised of his or her Fifth Amendment rights prior to any questioning. *Id.* at 444. A suspect may waive those rights, "provided the waiver is made voluntarily, knowingly, and intelligently." *Id.*

---

[3] Therefore, if this matter proceeds to trial, the Government must inform defense counsel prior to the final pretrial conference of the portions of the interrogation it intends to offer. Jesse may then renew in a motion in limine his request to exclude the statements as irrelevant under Federal Rule of Evidence 401 or unduly prejudicial pursuant to Federal Rules of Evidence 403.

A waiver is voluntary, knowing, and intelligent if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "The relevant question is not whether the 'criminal suspect knew and understood every possible consequence of a waiver of the Fifth Amendment privilege,' but rather whether the 'suspect knew that he could choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking any time.'" *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009) (brackets omitted) (quoting *Colorado v. Spring*, 479 U.S. 564, 573-74 (1987)). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). Jesse does not identify circumstances that would render his waiver involuntary. Instead, the deficiencies he identifies relate to whether his waiver was made knowingly and intelligently.

Jesse does not claim that he lacked the mental capacity to understand the nature of his rights or the consequences of waiving those rights. The interview in fact reflects that at the time he was arrested, Jesse was twenty years old and attending technical school for aircraft mechanics in Georgia. Detective Trooper

Rucinski's affidavit in support of the search warrant also reflects that Jesse had been arrested before and therefore was likely familiar with the *Miranda* warnings. Jesse does not suggest that drugs, alcohol, or medication impaired his ability to understand and waive his rights.

Jesse argues only that his waiver was not voluntary because the agents did not give him a written advice of rights form[4] or an adequate opportunity to reflect on his rights before they began questioning him. Instead, immediately after advising Jesse of his rights and before waiting for Jesse to affirmatively acknowledge that he understood his rights and was waiving them, Agent Rummel began asking him questions.

The Court is bothered by Agent Rummel's failure to elicit a verbal response from Jesse after reading him his rights and beginning to question him. Nevertheless, Supreme Court precedent holds that an express statement is not

---

[4] The interrogation was not videotaped, but the audio recording of the interview suggests that Agent Rummel did in fact present Jesse with written warnings:

| Agent Rummel: | So you understand your rights that I read you before? Do you want me to show you on paper or anything like that so you know I'm not missing anything? |
| Jesse: | Yeah just show it to me. |

(ECF No. 48-1 at Pg ID 182.) It seems from Agent Rummel's subsequent restatement of the *Miranda* warnings that he is reading from a document.

indispensable to a finding of waiver. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *Berghuis v. Thompkins*, 560 U.S. 370, 383 (2010) (explaining that "[t]he course of decisions since *Miranda*, informed by the application of *Miranda* warnings in the whole course of law enforcement, demonstrates that waivers can be established even absent formal or express statements of waiver that would be expected in, say, a judicial hearing to determine if a guilty plea has been properly entered."). Moreover, in *United States v. Miggins*, 302 F.3d 384 (6th Cir. 2002), the court rejected the defendant's assertion that a suspect must sign a waiver form listing his or her rights, noting that the defendant offered "no authority, and none can be found, for the proposition that a written waiver is necessary to establish a knowingly, intelligent and voluntary waiver of *Miranda* rights." *Id.* at 397.

"An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence." *Thompkins*, 560 U.S. at 384 (citing *Butler*, 441 U.S. at 376). "[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding th[e] case, including the background, experience, and conduct of the accused.'" 441 U.S. at 374-75 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). "As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Thompkins*, 560 U.S. at 385 (citations omitted).

The overall circumstances reflect that Jesse knowingly, voluntarily, and intelligently waived his *Miranda* rights. Nevertheless, Jesse claims that he subsequently invoked his right to counsel during the interview. In *Edwards v. Arizona*, 451 U.S. 477 (1981), the Supreme Court held that, if at any time during the interrogation the suspect indicates that he or she wishes to remain silent or consult an attorney, the police must immediately cease their questioning. *Id*. at 484-85. However, even if a suspect has invoked his or her right to counsel or to remain silent, "any information he [or she] then *volunteers* is admissible, provided it did not result from further interrogation." *Tolliver v. Sheets*, 594 F.3d 900, 919 (6th Cir. 2010) (emphasis in original) (citing *Miranda*, 384 U.S. at 478).

"[A] suspect must unambiguously request counsel" to trigger *Edwards* and compel officers to end their questioning. *Davis v. United States*, 512 U.S. 452, 459 (1994). "Although a suspect need not 'speak' with the discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459. In *Davis*, the Supreme Court recognized that good police practice may be for officers to clarify whether or not a suspect actually wants to invoke his or her Fifth Amendment rights when the suspect has made an ambiguous or equivocal statement. *Id*. at 461. Nevertheless, the Court "decline[d] to adopt a rule requiring officers to ask clarifying

questions[,]" providing that "[i]f the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Id*. at 461-62.

Whether a suspect has actually invoked his right to counsel is "an objective inquiry." *Davis*, 512 U.S. at 458 (citing *Connecticut v. Barrett*, 479 U.S. 523, 529 (1987)). "Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Id.* (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)). Officers may not disregard the ordinary meaning of the suspect's statement, and that meaning may be only a limited invocation of the suspect's rights. *See Barrett*, 479 U.S. 529 (suspect's expressed desire to have counsel present before making a written statement did not invoke right to counsel before giving an oral confession); *Boles v. Foltz*, 816 F.2d 1132, 1135 (6th Cir. 1987) (suspect's request for counsel at his preliminary hearing "did not express his desire to deal with the police only through counsel[]" and thus did not invoke the right to have counsel present during his interrogation).

Recently, in *United States v. Potter*, 927 F.3d 446, 451 (6th Cir. 2019), the court collected statements it previously found insufficient to trigger *Edwards*, and those it found sufficient:

> Davis's clear command has doomed several *Edwards* claims in our circuit. Take, for example, the statement "I think I should talk to a

lawyer, what do you think?" Was that an unambiguous request for counsel? No. *United States v. Delaney*, 443 F. App'x 122, 130 (6th Cir. 2011). How about "'[i]t would be nice' to have an attorney"? Insufficient. *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994); *cf. Henness v. Bagley*, 644 F.3d 308, 319-20 (6th Cir. 2011). Or "I really should have a lawyer, huh?" Equivocal. *United States v. Mays*, 683 F. App'x 427, 433 (6th Cir. 2017); *see also United States v. Amawi*, 695 F.3d 457, 484-85 (6th Cir. 2012). …

We have, by contrast, found requests for an attorney unambiguous (triggering *Edwards*) when a suspect told the police that he wanted to be left alone "until I can see my attorney," *Tolliver v. Sheets*, 594 F.3d 900, 923 (6th Cir. 2010), or directed the police to "call his attorney's phone number," *Moore v. Berghuis*, 700 F.3d 882, 887 (6th Cir. 2012). We have even reached that result when a person said "maybe I should talk to an attorney by the name of William Evans." *Abela v. Martin*, 380 F.3d 915, 926-27 (6th Cir. 2004), abrogated on other grounds by *Guilmette v. Howes*, 624 F.3d 286 (6th Cir. 2010). Despite the "maybe" in this statement, we said that the surrounding circumstances—the suspect referred to a specific attorney, the suspect handed the officer the attorney's business card, and the officer said that he would call the attorney—turned what would otherwise be an equivocal request into an unambiguous one. *Id*. …

*Potter*, 927 F.3d at 451. In *Potter*, the Sixth Circuit concluded that the defendant's "mere mention" of an attorney and inquiry as to whether he needed counsel was insufficient to unambiguously invoke his right to counsel. *Id.* "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, [Supreme Court] precedents do not require the cessation of questioning." *Davis*, 512 U.S. at 459 (emphasis in original).

After reading the *Miranda* warnings to Jesse, Agent Rummel asked Jesse what questions he had, specifically about the charges against him. Jesse responded, asking "what's going on … what "do I have to do with anything?" (ECF No. 48-1 at Pg ID 183; ECF No. 61-1 at Pg ID 290.) Agent Rummel then referenced the search of Jesse's home in June 2018, and asked Jesse who else was present at the home at the time of the search. After Jesse named the individuals who were there, Agent Rummel switched the conversation to a request Jesse apparently made before the recording began for someone to call his mother to let her know he had been arrested. The agents and Jesse also went through the property Jesse had on his person, which needed to be stored or given to his mother while he was detained. The discussion then turned to Jesse's current residence in Georgia, where he was attending school, his studies, and his scheduled flight back to Georgia that evening.

Agent Rummel next began discussing the guns that were seized at the residence Jesse shared with his family in June 2018. Jesse told the agents that he did not know the guns were in the house, but that officers subsequently told him what weapons had been seized. Jesse claimed that he did not know whose guns they were. He then answered the agent's questions about whether anyone in the house legally owns firearms, explaining that his older brother Ivan has a CPL and that he has another brother over the age of twenty-one who also can legally possess

weapons.  Jesse contends that he invoked his right to counsel in the exchange that

followed:

> Agent Rummel: Ok, I'm saying that these specific guns that were removed from the house, did he [Ivan] say that those are my guns to you or did he tell you or what?
>
> Jesse: I, that's on, I don't even, we don't even gotta discuss that because I don't have my lawyer in the room
>
> Agent Rummel: Ok.
>
> Jesse: So . . .
>
> Agent Rummel: Gotcha.
>
> Jesse: My brother, my other brother, he's over twenty-one, he can have firearms too.  He already took his certificate …

(Resp. Ex. A.)

Jesse's statement, however, did not unequivocally and unambiguously

invoke his right to counsel.  At best, Jesse expressed his desire to not answer

questions about what his brother told him about the seized guns.

Shortly thereafter, Agent Rummel engaged in a lengthy monologue, which

lasted from the 12:50 mark to the 16:57 mark in the interview.  In this statement,

Agent Rummel essentially expressed to Jesse that ATF already knew a lot about

his connection to the seized guns, but that they were seeking whatever new

information he could provide, such as where the seized guns came from, generally

where people get their guns, why a lot of people seemed to be attracted to FNs (a specific type of weapon), and why they carry FNs. In response, Jesse said:

> Man. If you want to talk about my stuff that's going for me in Atlanta like I told 'em, where I was going to be going to, my new school and work and stuff like that, we can. Other than that, I don't want to talk about this bro'. Cuz', I ask from the get go, do I need my lawyer and I'm thinking, that's what it is looking like. Like I need my lawyer.

(Resp. Ex. A.)[5] Unlike Jesse's earlier reference to counsel, this statement was an unequivocal and unambiguous invocation of his right to counsel.

A reasonable officer would know that Jesse was not asking the agents whether he needed a lawyer or expressing that he might need one. In context, following Agent Rummel's statement, Jesse unambiguously expressed that he did not want to talk with the agents about guns—whether those seized from his residence or guns generally—without consulting counsel. While Jesse continued speaking with the agents thereafter, he only did so in response to their continued statements and questions. After a suspect clearly invokes his *Miranda* rights, the suspect's responses to further questioning "may not be used to cast doubt on the clarity of his initial request for counsel." *Smith v. Illinois*, 469 U.S. 91, 92 (1984).

---

[5] The Court finds significant discrepancies between the audio recording and Jesse's transcription of what he said at this point. (*See* ECF No. 48-1 at Pg ID 190.) While the Government's transcription is more accurate (*see* ECF No. 61-1 at Pg ID 293), the Court finds sufficient discrepancies from what it hears on the recording that it is using its own transcription.

For these reasons, the Court holds that Jesse's statements after the 16:57 mark of the interrogation were obtained in violation of his Fifth Amendment rights and must be suppressed. The statements Agent Rummel made in his lengthy monologue preceding the invocation therefore are not relevant and also are excluded. As stated earlier, if this matter proceeds to trial, Jesse may renew his argument that the Federal Rules of Evidence require the exclusion of specific statements preceding the 16:57 mark.

## Conclusion

For the reasons set forth above, the Court concludes that Jesse is not entitled to the discovery he seeks in advance of trial. The search and seizure of Jesse's cell phone did not violate his Fourth Amendment rights. However, Jesse's Fifth Amendment rights were violated when he invoked his right to counsel 16:57 minutes into the March 17, 2019 interrogation. The Court, therefore, is suppressing his statements thereafter. The Court is further excluding Agent Rummel's statement immediately preceding the invocation.

Accordingly,

**IT IS ORDERED** that Defendant Jesse Hawkins' Motion for Disclosure of Witness List, Exhibit List and Additional Witness Information in Advance of Trial (ECF No. 43) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Jesse Hawkins' Motion to Suppress Evidence (Cell Phone) (ECF No. 45) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Jesse Hawkins' Motion to Suppress Post-Arrest Statement (ECF No. 48) is **GRANTED IN PART AND DENIED IN PART** in that his statements after he unambiguously invoked his right to counsel are suppressed, as well as Agent Rummel's statement immediately preceding the invocation.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: December 12, 2019